(33 South. 776.)

No. 14,586.

STATE ex rel. KNOLLMAN et al. v. KING, Judge.*

(Jan. 19, 1903.)

MUNICIPAL CONTRACTS — ADVERTISEMENT —
ANTICIPATION OF REVENUES—
CURATIVE ACT.

1. A charter requirement for the letting of contracts by advertisement is not complied with, if the contract as advertised is on its face null and void.

2. A contract by the city of New Orleans for the construction of an electric light plant does not form an exception to the rule of Act No. 30 of 1877, prohibiting the municipalities of the state from anticipating their revenues.

3. Act No. 32 of 1902 does not have a retroactive operation.

4. The case of Railroad Company v. Police Jury of the Parish of Bienville, 19 South. 282, 48 La. Ann. 331, distinguished.

(Syllabus by the Court.)

Application by the state, on relation of Henry Knollman and others, against Fred D. King, judge of the civil district court, parish of Orleans, for writs of mandamus and prohibition. Writ of mandamus made peremptory.

Benjamin Rice Forman, for relators. Respondent judge (Foster, Milling, Godchaux & Sanders, Thomas H. Thorpe, and Arthur McGuirk, Asst. City. Atty., of counsel), pro se.

On Application for Writs of Mandamus and Prohibition.

PROVOSTY, J. The charter of the city of New Orleans requires that all contracts of the city for more than $500 shall be let out to the lowest responsible bidder after advertisement. A requirement of this kind is mandatory, and a contract given out without observance of it is null and void. Redersheimer v. Mayor, 52 La. Ann. 2089, 28 South. 299; Dillon, Mun. Corp. § 466 (388); Am. & Eng. Ency. of Law (1st Ed.) vol. 15, p. 1093. With regard to the strictness with which requirements of this kind are enforced, Tiedeman, Mun. Corp. § 172, has the following:

"Yet, if notice, advertising, and similar pre-

*Rehearing denied March 2, 1903.

liminaries are required by statute, neither the corporation nor any of its officials can make a valid contract, which shall bind the corporation, unless the statute is rigidly complied with. So, if there be an informality or irregularity in giving the notice, in writing proposals, or in selecting the proper newspaper in which to advertise for bids, or in the substitution of advertising, when the posting of a printed notice is required, the contract may be avoided. But a mere typographical error, the notice in other respects being sufficient, by which no one was misled, is not material.

"In fairness to bidders, it has been held that they must be supplied with such information as will enable them to act intelligently; and the bidder should not be compelled to furnish his own plans and specifications, which the notice must provide for. So, if the specifications be indefinite as to the quantity and quality of the materials required, the contract based thereon will be void. Nor can a public officer, required to advertise for bids, fix therein an arbitrary price for certain specified work."

The city of New Orleans advertised for bids on a contract for the construction of an electric light plant, the cost of which it was estimated would be not less than $850,000. How the city proposed to obligate herself to pay this sum, or whatever sum might turn out to be the price of the contract, was made a specification of the contract, as follows:

"Payment. (a) The cost of the lighting and power system and the interest on deferred payments will be paid from the alimony and reserve fund accounts in such annual installments as may be necessary to extinguish the entire debt within a period of not exceeding ten (10) years.

"(b) Deferred payments will bear interest at the rate of 5 per centum per annum. Interest on deferred alimony account payments will be paid from the alimony appropriation; interest on deferred reserve fund account payments will be paid from the reserve fund appropriation.

"(c) The city council obligates itself to write as item 1 in the budget of expenditures, each year for ten (10) consecutive years, not less than eighty-five thousand dollars ($85,-000).

"The city council further obligates itself

to provide, in ten (10) equal consecutive annual installments, in item 4 of the reserve fund, budget of expenditures, such amount, over and above the eighty-five thousand dollars ($85,000) that will be written in item 1 of the budget of expenditures, as may be necessary to entirely and fully liquidate the contract price for the construction of the lighting and power system, together with accrued interest on deferred payments.

"(d) The city of New Orleans reserves the right to, at any time it may elect, cancel any or all outstanding certificates, or to make part payment on outstanding certificates, in which event interest will be paid for the time only that payment of the principal has been deferred.

"(e) Partial payment certificates to the extent of 80 per cent. of the value of the completed work shall be issued monthly. The said partial payment certificates shall not exceed one-fifteenth part including principal and interest, of the total amount to be paid out of the alimony appropriation.

"On completion of the entire lighting and power system, and its acceptance by the city engineer and city electrician, they will issue to the contractor certificates of payment, which shall include all amounts reserved and balances due."

The advertisement first appeared on the 7th of February, and ran to the 7th of April. Four days before its first appearance, namely, on the 3d of February, this court had handed down its decision in the case of Woulfe v. City of New Orleans et al., 107 La. 777, 32 South. 88. In that case a contract of the city for the repaving of Canal street, the principal street of the city, was held to be null and void, because the price was payable out of the future revenues of the city, and because certificates to serve as evidence of the amount due the contractor were to be issued as the work progressed. The decision was based upon a statute of long standing, Act No. 30 of 1877, Extra Session, prohibiting the police juries and the municipalities of the state from anticipating their revenues. This act, which has a material bearing on the present case, is as follows:

"Section 1. Be it enacted, etc., that no police jury of any parish, nor any municipal corporation in this state, shall make any appropriation of money for any year which appropriation separately, or together with any other appropriation or appropriations of the same year, shall be in excess of the actual revenue of said parish or municipal corporation for that year.

"Sec. 2. Be it further enacted, etc., that no police jury of any parish nor municipal corporation in this state shall approve any claim or make any expenditure which shall separately, or together with other claims approved or expenditures made, be in excess of the actual revenues of that year.

"Sec. 3. Be it further enacted, etc., that the revenues of the several parishes and municipal corporations of this state, of each year, shall be devoted to the expenditures of that year; provided, that any surplus of said revenues may be applied to the payment of the indebtedness of former years.

"Sec. 4. Be it further enacted, etc., that the police juries of the several parishes in this state may and are hereby authorized and empowered to contract for fixed and determined sums of money with those officers who receive in compensation for services under existing laws, fees, commissions or mileage from said parishes; provided, the compensation allowed shall not exceed fifty per centum of the fees allowed by the laws of the state.

"Sec. 5. Be it further enacted, etc., that no (evidence of indebtedness or) warrant for the payment of money shall, after the first day of October, eighteen hundred and seventy-seven, be issued by any officer of any parish or municipal corporation in this state, except against money actually in the treasury of said parish or municipal corporation. Any person violating the provisions of this section shall, on conviction, be punished by imprisonment or fine, or both, at the discretion of the court; provided, that this section shall not apply to the certificates issued to jurors and witnesses for their services in the courts.

"Sec. 6. Be it further enacted, etc., that all laws in conflict with this act are hereby repealed."

It is observed that the stipulation for payment out of the revenues of future years, contained in this electric light plant contract, was apparently in direct contravention of this act of 1877. The act prohibits the anticipation of revenues and the issuing of evidences of indebtedness, and the contract pro-

posed to anticipate the revenues as far as ten years ahead and to issue interest-bearing certificates of indebtedness. Therefore, both under the express provisions of this act of 1877 and under the decision of this court in the Woulfe Case, this electric light plant contract, as advertised, was apparently illegal. Whether persons desiring to bid on the contract were, or not, deterred from doing so by this apparent nullity, does not affirmatively appear; but the fact is that at the close of the advertisement period there had been put in one bid only. This solitary bid was opened by the finance committee of the council on the 7th of April, and was on the same day referred to the comptroller for reference to the council. On the next day (the 8th of April) it was referred by the council to the finance committee. In the hands of the committee it remained for nearly four months, until on the 29th of July it was reported to the council with a unanimous approval.

In the brief submitted in behalf of the city the following statement is made:

"The proposition that confronted the city engineer, the city electrician, and the superintendent of drainage, in preparing the plans and specifications for the proposed lighting system, was, viz.:

"(1) The inadvisability of expending a large sum of money in making investigations and surveys, with no certainty that a satisfactory and acceptable bid would be received, and that the system would be built.

"(2) The advisability of promptly completing the plans and specifications, in order that advertisements might be made, bids received, and a contract entered into at an early date, to secure the completion of the system and its operation by the date (December 31, 1902) at which the present expensive public lighting contract will expire."

In view of the advisability which thus existed for prompt action, the long delay from the 8th of April to the 29th of July is unaccountable, unless it be that the committee was at first awaiting the action of this court upon a rehearing applied for in the Woulfe Case, and after this rehearing had been refused was awaiting the passing and the going into operation of Act No. 32 of the Session of the Legislature of 1902. That act read as follows:

"An act to amend and re-enact Act No. 30 of the General Assembly of 1877, Extra Session, approved March 28, 1877, entitled 'An act to limit the appropriations and expenditures of parishes and municipal corporations, to prohibit the issue of warrants by their officers, to permit police juries to make certain contracts, and prescribing certain penalties,' to permit police juries and municipal corporations to make contracts against future revenues within certain restrictions, to permit police juries and municipalities to issue certificates of payment and to provide the effect to be given to such certificates, and to permit municipalities to borrow money in case of public emergency.

"Section 1. Be it enacted by the General Assembly of the State of Louisiana, that no police jury of any parish nor any municipal corporation in this state shall, in any one year, make any appropriation, or approve any claim against or make any expenditure from the annual revenue for that year, which appropriation, approved claim or expenditure, shall separately or together with other appropriations, approved claims or expenditures, be in excess of the estimated revenue of that year.

"Sec. 2. Be it further enacted, etc., that the revenues of the several parishes and municipal corporations of this state, of each year, shall be dedicated as follows: First, all statutory charges shall be paid from the respective funds upon which they are imposed; second, all charges for services rendered annually under time contracts; third, all necessary usual charges provided for by ordinance or resolution. Any excess of revenue above statutory, necessary and usual charges may be applied to the payments of amounts due and unpaid out of the revenues of former years. Police juries and municipal corporations shall also have authority to make, in any year, agreements or contracts dedicating in whole or in part the excess of annual revenue of subsequent years above statutory necessary and usual charges; provided that no such agreement or contract shall have any longer terms fixed for payment than ten years from the date of the agreement or contract, and provided further, that no dedication of future revenues shall be made which, alone or with other prior

dedications in force, shall exceed the estimated excess of revenues over the statutory, necessary and usual charges of the year in which the agreement or contract is made; provided further, that nothing in this act shall be taken or construed to prohibit police juries or municipal corporations from providing by ordinance or resolution for the expenditure of funds derived from miscellaneous or contingent sources actually collected, subject to such dedication of such funds as may be established by existing laws.

"Sec. 3. Be it further enacted, etc., that parishes and municipal corporations shall have authority to issue certificates of payment covering that portion of the cost of public improvements which by existing laws is to be borne by parishes and municipalities under contracts payable out of the revenues of subsequent years as provided for in section 2 of this act. Such certificates shall bear such rate of interest as may be fixed by the contracts under which they are issued, but said interest shall never exceed five per centum per annum. Such certificates shall have no other effect than to furnish prima facie evidence that the contractor is entitled, for work done at the prices fixed by the contracts, to a fixed amount of money; provided all stipulations of the contracts under which such certificates have been issued have been complied with.

"Sec. 4. Be it further enacted, etc., that municipalities shall have authority in cases of public emergency, to be determined by the municipalities, to borrow money in sums necessary to meet such emergencies; provided that the repayment of such sums shall be a fixed charge upon the revenues of the year next following the year in which said sums are borrowed.

"Sec. 5. Be it further enacted, etc., that no evidence of indebtedness or warrants for the payment of money shall be issued by any officer of any parish or municipal corporation in this state, except against money actually in the treasury of such parish or municipal corporation; provided that this section shall not apply to the certificates of payment authorized to be issued under section 3 of this act, or to certificates issued to jurors and witnesses for their services in the courts.

"Sec. 6. Be it further enacted, etc., that any officer violating any of the provisions of this act, on conviction, shall be punished by imprisonment or fine, or both, at the discretion of the court; provided, that the fine shall not exceed one thousand dollars or the imprisonment one year.

"Sec. 7. Be it further enacted, etc., that all laws or parts of laws, contrary to or in conflict with the provisions of this act be and the same are hereby repealed."

The favorable report of the finance committee was made immediately after the going into operation of this act. On the day itself of the report an ordinance was introduced into the council to carry the recommendation into effect. Under the rules this ordinance lay over for one week. On the 5th of August it was adopted, and on the next day was signed by the acting mayor. It directed the mayor to enter into a contract with the solitary bidder, Herbert A. Bullard. Before the ordinance could be promulgated a suit was filed by the City Item Publishing Company, Limited, to enjoin the city from entering into the contract, and a few days thereafter the relators in the present proceeding filed a similar suit. The judge made a rule to show cause why the injunction should not issue, and after hearing refused to grant the writ. The present proceeding followed. It is an application for a mandamus to compel the lower judge to grant the injunction and for a writ of prohibition to stay proceedings meanwhile.

The petition for injunction, after alleging the quality of the plaintiffs (relators here) as taxpayers, proceeds as follows:

"Petitioners show that about 7th February, 1902, the city council passed, and the mayor approved and caused to be promulgated, Ordinance No. 1098, a copy of which is annexed and made a part of this petition, directing the comptroller to advertise for bids for the construction of a plant for a public electric lighting and power system for the city of New Orleans, to be constructed in 15 months, and to be paid for in 10 annual installments, as provided in section 29 of said ordinance; and it was contemplated in the ordinance that the city should pay at least $850,000, besides 5 per cent. interest, although the necessary plant for an electric lighting and power system, as petitioners are informed and believe, could be constructed for a sum not exceeding $600,000. At the time of

the passage of said Ordinance 1098, the city of New Orleans had not in her treasury, and at no time since has she had in her treasury, the sum of $850,000 with which said electric light and power plant could be paid for. All her revenues for the year 1902 have been budgeted and consecrated to the purposes named in the annual budget, and the persons in whose favor said items had been budgeted could not be lawfully deprived of the sums, and the city council was without power to divert said sums as so appropriated in the budget, and the said ordinance is and was illegal, null, and void, because in derogation of the prohibition of Act No. 30 of 1877, as interpreted and applied in the case of State ex relatione James J. Woulfe v. The City of New Orleans, 107 La. 777, 32 South. 88, which was then pending.

"That in consequence of the illegality of said ordinance, and the advertisement made in pursuance of it, no legally binding contract could be made under said ordinance or said contract. Several competent persons were ready and willing to bid in competition to do the work contemplated, but were advised by their counsel that the city of New Orleans had no power to make a contract payable out of the revenues for future years, and issue certificates of indebtedness therefor bearing 5 per cent. interest, and consequently refrained from bidding, and only one person bid, to wit, Herbert A. Bullard. That, after the decision of the Supreme Court in the Woulfe Case, the city council realized that they could not legally accept Bullard's bid and make a contract with him, and postponed action on the matter until after the passage of Act No. 32 of 1902, approved 19th June, 1902, promulgated and becoming operative 20 days thereafter, to wit, 23d July, 1902, when under the erroneous pretext that said last-named statute had a retroactive effect, and validated said void ordinance, adopted 7th February, 1902, said city council hastened to pass an ordinance on 5th August, 1902, accepting said Bullard's bid to do the work for the price of $1,369,311.20, with 5 per cent. interest.

"That the revenues of the city of New Orleans are not sufficient to carry on the city government, carry out existing obligations, and pay said sum. The work, if advertised now legally, could be done for $850,000, possibly $600,000. One Frederick P. Morrel has offered to advance the cost of a new advertisement, and to deposit $50,000 as a forfeit, and to bind himself, if the work is now readvertised and reoffered, to bid, contract, and bind himself to do the work for $150,000 less than the bid of said Bullard.

"That by the act of the majority of the city council in August, 1902, in accepting said bid of Bullard for $1,369,311.20, they were guilty of gross neglect of duty, extravagance, and misconduct, well knowing, as they did, that by readvertising the contract, under Act No. 32 of 1902, when it would be legally binding, they could save the taxpayers of New Orleans at least $150,000, if not more. Act No. 32 of 1902 does not, and does not attempt to, validate the Ordinance No. 1098, passed 7th February, 1902, nor to have a retroactive effect, and, if it did, it would be repugnant to articles 47 and 48 of the Constitution; and the carrying out of any contract with Herbert A. Bullard resulting from the acceptance in August, 1902, of a bid made in March, 1902, would be illegal, and payments of public money thereunder would be a waste of the money of petitioners and other taxpayers.

"Petitioners allege they are informed and believe, and so aver, that the public press and the people were opposed to the acceptance of said bid of Bullard; that the mayor, Hon. Paul Capdevielle, urged postponement for more careful consideration; that he was only temporarily at a nearby seaside resort, and had not vacated his office, and asked delay in order that he might more maturely consider the question in all its bearings, but William Mehle, acting mayor, with undue and unusual haste, signed the ordinance of August, 1902, accepting the bid of H. A. Bullard, before the mayor could see or consider it.

"Your petitioners further show that they are informed and believe, and so aver, that the said ordinance was drawn at the instance and request of H. A. Bullard and by his counsel, and so skillfully drawn, in his interest, so vague and indefinite, as to leave an enormous margin of profit, and, since the law requires such contracts to be let to the lowest bidder, it means that the contract and specifications, as advertised, shall be so drawn as to notify bidders exactly and pre-

cisely what they are required to do, and the ordinance is null and void, because it does not provide fairly, specifically, and in good faith what shall be done under it, so as to put all bidders on an equal footing, and not so as one with a friendly engineer and electrician could make an enormous profit, and with an engineer exacting and standing up for the people's interest would make little or nothing.

"Wherefore petitioners pray that an injunction issue enjoining the city of New Orleans and William Mehle, acting mayor, and Vital Tujacque, comptroller, from entering into any contract with Herbert A. Bullard to carry out the ordinance of August, 1902, accepting his bid for erecting an electric light and power plant or system, and that the city of New Orleans, William Mehle, acting mayor, Vital Tujacque, comptroller, and Herbert A. Bullard be cited, the injunction be perpetuated, and Ordinance No. 1098, C. S., of 7th February, 1902, and ordinance of August, 1902, accepting H. A. Bullard's bid to erect an electric light and power plant in question, be decreed null and void, and for general relief."

We shall give no consideration to the allegations in this petition impugning the conduct of the city authorities in making the award to Bullard. An opportunity was afforded the relators to administer proof of this allegation on the trial of the rule, and they failed to take advantage of it. Nor shall we give any consideration to the allegation of the insufficiency of the specifications in point of definiteness and particularity. The matter is too complicated and technical to be dealt with by this court without the aid of experts. For all the court knows, what appears vague in one place may be rendered definite by something to be found elsewhere in the voluminous document of 200 printed pages containing the specifications. If plaintiffs were relying seriously upon this ground, it was incumbent on them to make the matter plain and certain by means of expert testimony, or at any rate by demonstration on the face of the papers. They have done neither.

There arises, however, a legal question under the allegations; and we proceed to consider it. It is whether, under the circumstances detailed above, this contract can be said to have been preceded by advertisement as required by the city charter. The solution of that question must depend upon whether the contract as advertised was or was not on its face an illegal contract. No one, we imagine, will say that the invitation for bids upon a contract null and void on its face, not binding on the city, enjoinable at any time at the suit of any one of the thousands of taxpayers of the city, is a compliance with the requirement in question. If it is, then this very important requirement can be circumvented with perfect ease. All that need be done is to give to the contract an illegal shape for the purpose of the advertisement, and then to reshape it for the purpose of the award. If the right person is the lowest bidder, the contract will be reshaped and awarded. If the wrong person is the lowest bidder, the intruder will have to take the contract as advertised or leave it alone. The point will not bear discussion. The requirement has not been imposed for buncombe.

As stated above, the contract as advertised fell to all appearance squarely within the prohibition of the act of 1877, and apparently was null and void upon its face. The contention is, however, that it does not so fall, and is not in contravention of the act, because it forms an exception to the rule established by the act; that a mandatory statute imposed upon the council the duty to enter into it, a statute leaving no discretion to the council in the matter; and that to contracts thus required to be entered into the act of 1877 does not apply.

The mandatory statute in question is section 14 of the city charter, which reads as follows:

"Sec. 14. The council shall have power and it shall be their duty to pass such ordinances, and to see to their faithful execution, as may be necessary and proper (1) to preserve the peace and good order of the city; (2) to maintain its cleanliness and health, and to this end; (a) to adopt and provide an efficient system of drainage; (b) to provide for the inspection and cleanliness of all vaults, privies, yards, poles, markets, cemeteries; (c) to regulate the location and inspection and cleansing of dairies, stables, cattle yards, landings and pens, slaughter houses, soap, glue, tallow and leather factories, deposito-

ries for hides, and all places of business likely to be or become detrimental to the health, and to adopt such ordinances and regulations as shall be necessary or expedient for the protection of health and to prevent the spread of disease, and to maintain a good sanitary condition in the streets, public places and buildings, and on all private premises. The common council shall provide for the frequent inspection of all premises by persons to be designated, either by the common council or by the board of health in the city. They shall also prescribe what water supply shall be provided by the owners of private premises, and that all premises, yards, streets and alleys shall be kept in a cleanly condition; shall provide for the punishment of any violation of such ordinances or regulation, by fine or imprisonment, or both; and all such fines, when recovered, shall be paid over to the board of health to assist in its maintenance; (d) to suppress all nuisances; (e) to prevent the sale of adulterated or decayed food and to punish the same; to punish the sale of adulterated drinks; (3) to open, and keep open and free from obstruction, all streets, public squares, wharves, landings, lake shore and river and canal banks; (4) to keep the streets and crossings and bridges and canals and ditches clean and in repair; (5) to adequately provide for the maintenance of an efficient police force and fire department; (6) to light the streets, wharves, landings and public squares; (7) to organize and maintain free public schools; (8) to maintain levees, dykes, and to protect the city from overflow, and to provide for the drainage thereof."

It is perfectly evident that while the duty is here imposed upon the city to "light the streets, wharves, landings and public squares," the means to be adopted to that end are left entirely at her discretion. In fact, it is too plain for argument that if, in enacting section 14, a particular mode of fulfilling the duty of lighting the streets, etc., was contemplated, it was the mode theretofore in vogue, and not this experiment of a municipally owned and operated electric light plant. It is entirely and perfectly safe to say that the framers of section 14 never even dreamed of imposing upon the city council the mandatory duty of entering into such a contract as the one here proposed.

Besides, the duties imposed by section 14 are the ordinary duties of a municipal corporation; the expenses to be incurred in the discharge of these duties are the ordinary, current expenses of the municipality; and if the prohibition of the act of 1877 does not apply to these everyday expenses, it is pertinent to ask, to what expense does it apply? Is the act of 1877 to be made to read that the police juries and the municipalities of the state are forbidden to exceed their current revenues, except for their current expenses? Surely this would be a strange interpretation of the statute. It may be perfectly true, and probably is, that section 14 of the charter, in so far as it imposes a duty, is equally mandatory with section 2746 of the Revised Statutes, which this court declared in the case of Railroad Company v. Police Jury of Bienville Parish, 48 La. Ann. 331, 19 South. 282, created an exception to the rule of the act of 1877. But between the two statutes there is, in their bearing upon the present discussion, this fundamental difference: that, while the one imposes an ordinary duty to be provided for out of current funds, the other imposes a duty altogether out of the ordinary, a duty such as no one would for a single instant suppose could be provided for out of the revenues of a single year.

The duty imposed by section 2746 is "to provide a good and sufficient courthouse." In the brief filed in behalf of the respondent judge we find the following:

"The court will notice that, whilst the language of section 2746 of the Revised Statutes makes it obligatory upon the various police juries throughout the state to provide a good and sufficient courthouse, it does not seek to determine for the police juries the mode and manner of carrying out this mandatory duty; and so it would be clearly competent for the police juries throughout the state to rent a courthouse by the day, month, or year, or to buy a building already constructed and use it for a courthouse, or to contract for the building of a courthouse, either log, frame, brick, or stone, paying for same any sum which in their judgment was proper and just."

What is here said in regard to the possibility of providing a courthouse by renting a building, and even by constructing a frame house or a log house, is true as a general proposition; but it is not true as applied to

the performance of the duty imposed by section 2746. A city, parish, state, or nation owns its own city hall, courthouse, statehouse or capitol, and makes it as substantial as its means will allow, and does not undertake to pay for the structure with what may be spared out of the revenues of one year. So it is safe to say that, when the legislature imposed upon the police jury of Bienville parish the obligation "to provide a good and sufficient courthouse," it did not mean that there should be rented a house, nor that there should be built a log house, nor a frame house, nor that there should be furnished any other makeshift; but it meant that there should be provided a permanent and substantial courthouse, by its massiveness giving promise of durability, such as ought to characterize a building destined to witness generations come and go within its precincts, by its proportions and aspect in keeping with the dignity of the people in their sovereign capacity, and with the solemnity of the rites to whose uses it would be dedicated; in a word, a palace of the people and a temple of justice. This is what is meant by section 2746, and this is what, in less inflated language, the court expressed when, in deciding the Bienville Parish Case, it said: "The building of a courthouse is a considerable undertaking for a parish, probably no parish in the state, out of the 10-mill tax, can pay in one year for a convenient and suitable building. Future appropriations become a necessity."

If any erroneous impressions had been created by the Bienville Parish decision in regard to the interpretation of the act of 1877, they had been corrected by the decision in the Woulfe Case, handed down four days before the first appearance of the advertisement.

It is said that at the time the bid was accepted by the city council there was ample legislative authority, viz.: Act No. 32 of 1902, for entering into the contract. Such is the fact; but in order that the contracts of the city should be valid, and proof against injunction at the suit of her taxpayers, it is not sufficient that they should be authorized. It is also necessary that they should have been let out to the lowest responsible bidder after due advertisement. The failure to comply with this mandatory requirement is what is complained of in this suit.

It is said, also, that Act No. 32 of 1902 operates retroactively, and validates from the beginning the proceeding leading up to this contract. The rule is that a law will not be given a retroactive operation, unless the intention that it should so operate is so clearly expressed that no other construction is possible (Cassard v. Zacharie, 52 La. Ann. 835, 27 South. 368, 49 L. R. A. 272); and this act plainly and clearly looks only to the future, and contains not a word even tending to impart retroactivity.

But, if the act did have a retroactive operation, the illegality complained of would not be cured. This a moment's reflection will make plain. The nullity results from the fact that no opportunity for competition was afforded. Now, the Legislature could in its almightiness reach back into the past and remove the disability of the city; but it could not roll back the past and make the delay for putting in bids elapse once more, and nothing short of the latter could afford an opportunity to put in bids. Concede to this act all the retroactivity that the Legislature had power to impart to it, and still the situation remains that contractors who desired to bid on this contract and were prevented from so doing by its nullity have not had an opportunity to bid. Still the situation remains that this contract has been given out without competition. We will say, in passing, that it is not pretended that there has been any intention on the part of the Legislature to dispense with the necessity for competition in the letting out of the contracts of the city.

It is also argued that the application for an injunction is premature because non constat that the city and Bullard will, after all, enter into the contracts if left alone. But how long were the plaintiffs to wait? Were not the parties to all appearance upon the point of entering into the contract?

In one of the briefs filed in behalf of the respondent judge we find the following:

"There would be no contention whatsoever that, if the council had not mentioned the terms of payment under this advertisement, but simply advertised for the work, and before the awarding of the contract the Legis-

lature had passed, as it did, Act No. 32 of 1902, that it would be absolutely within the power of the city to pay for same by the anticipation of the revenues conformably with said act. Now, by an examination of the proposal itself, twenty-ninth paragraph, it will be found that the section thereof marked (d) reads as follows: 'The city of New Orleans reserves the right at any time it may elect to cancel any and all outstanding certificates, or to make part payment on outstanding certificates, in which event interest will be paid for the time only that the payment of the principal has been deferred.' From an examination of this language, and taking into consideration, further, that the proposal itself granted to the contractor time in which to build the .plant, exceeding one year, it is plain that it would have been impossible, even if the city had had the money, to pay the entire price within any one year. It is further clear that if, after this advertisement was in, and after the work had been completed, the city had found herself in funds, it would be clearly within her power to pay for the entire plant in cash upon delivery. No portion of this advertisement, no portion of this contract, no proceedings whatever are attacked, save and except this one section of this advertisement, viz., section 29. Can it be held that this insertion in the advertisement of the manner and mode in which the city expected to pay for this plant is an essential portion of the advertisement itself?

"The city charter simply provides that contracts of this kind shall be advertised. The manner and mode of making advertisements are left entirely to the discretion of the council. This language was surplusage, and the city could not be bound by it. Neither can the contractor, unless it were carried into an executed contract."

Though we find this in the brief of the learned and able counsel, we can hardly realize that it is said seriously. It amounts to saying that the charter provision for the advertisement of contracts may be complied with by calling for bids on contracts null and void upon their face. We repeat, this proposition will not bear discussion. So far as concerns the reserve of the right to take up the certificates at any time, it formed no part of the obligation of the contract. The only obligation of the contract was to pay out of future revenues. This obligation was the cause of the nullity, and there was no other way to cure the nullity than to remove this obligation from the contract; and the reserve did not operate this removal, but left the obligation in full force and effect. The contract is proposed to be entered into in violation of the provision of the city charter requiring contracts to be advertised. The injunction should, therefore, have been granted.

It is therefore ordered, adjudged, and decreed that the mandamus prayed for be made peremptory.

BLANCHARD, J., concurs in the decree.

See dissenting opinion of BREAUX, J., 33 South. 783.